BILAL A. ESSAYLI
Acting United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
BENEDETTO L. BALDING (Cal. Bar No. 244508)
Assistant United States Attorney
Transnational Organized Crime Section
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Deputy Chief, Criminal Division
        1400/1200 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2274/1259
        Facsimile: (213) 894-0141
        E-mail:    benedetto.balding@usdoj.gov
                   alexander.schwab@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:22-CR-267-MEMF-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION WITH RESPECT TO DEFENDANT JOSE ANGEL DEL VILLAR |
| v. | |
| DEL ENTERTAINMENT, INC., et al., (2) JOSE ANGEL DEL VILLAR, | Hearing Date: 08-15-2025 Hearing Time: 10:00 a.m. |
| Defendant. | Location:   Courtroom of the Hon. Maame Ewusi-Mensah Frimpong |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Benedetto L. Balding and Alexander B. Schwab, hereby files its sentencing position with respect to defendant Jose Angel Del Villar.

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the evidence presented at trial, the presentence investigation report

("PSR"), and such further evidence and argument as the Court may permit.

Dated: August 1, 2025           Respectfully submitted,

                                BILAL A. ESSAYLI
                                Acting United States Attorney

                                CHRISTINA T. SHAY
                                Assistant United States Attorney
                                Chief, Criminal Division

                                _____/s/_____
                                BENEDETTO L. BALDING
                                ALEXANDER B. SCHWAB
                                Assistant United States Attorneys

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................2

III.  SENTENCING GUIDELINES........................................5

      A.   Determining the Most Analogous Guideline................6

      B.   The Value of the Funds Involved Exceeds $1.5 Million......8

      C.   The Value of the Funds Involved Should Not Be Limited
           to Defendant's Gain.....................................9

      D.   Defendant Knew the Funds Involved in His Illicit
           Relationship with Perez Were Proceeds of, or Intended
           to Promote, Unlawful Activity..........................10

      E.   The Safe Harbor Does Not Apply.........................11

      F.   Defendant Was an Organizer or Leader of Extensive
           Criminal Conduct.......................................12

IV.   ARGUMENT....................................................14

      A.   The Need for General Deterrence........................14

      B.   The Seriousness of Defendant's Personal Conduct.........15

      C.   Other Defendants Sentenced under the Kingpin Act........17

      D.   The Appropriate Fine...................................19

V.    CONCLUSION..................................................19

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

**Cases**

<u>United States v. Dominguez-Caicedo</u>,
  40 F.4th 938 (9th Cir. 2022) .......................................... 13

<u>United States v. Martin</u>,
  455 F.3d 1227 (11th Cir. 2006) ....................................... 15

<u>United States v. Mones Coro</u>,
  No. 21-924, 2022 WL 1565698 (2d Cir. May 18, 2022) .......... 17, 18

<u>United States v. Oseguera Gonzalez</u>,
  507 F. Supp. 3d 137 (D.D.C. 2020) ................................. 6

<u>United States v. Reese</u>,
  2 F.3d 870 (9th Cir. 1993) ........................................... 10

**Statutes**

18 U.S.C. § 1956.......................................................... 11

18 U.S.C. § 3553(a)(2)(A)............................................... 16

18 U.S.C. § 3553(a)(2)(B)............................................... 14

18 U.S.C. § 3553(a)(6).................................................. 17

21 U.S.C. § 1901........................................................ 7, 14

21 U.S.C. § 1904........................................................ 6

31 U.S.C. § 5318........................................................ 6, 11

**Sentencing Guidelines**

USSG § 2S1.1............................................................ 6, 11

USSG § 2B1.1............................................................ 9, 16

USSG § 2M5.1........................................................... 7

USSG § 2S1.3....................................................... passim

USSG § 2S1.3(b)(1)(A).................................................. 5, 10

USSG § 3B1.1........................................................... 5, 13

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

USSG § 4C1.1.............................................. 13

USSG § 8C2.1.............................................. 7

**Regulations**

31 C.F.R. § 598.202....................................... 10

**Other Authorities**

Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After
    Booker, 47 Wm. & Mary L. Rev. 721 (2005) ...................15, 16

Pres Release, U.S. Dep't of State, Designation of International
    Cartels (Feb. 20, 2025)..................................... 14

Merianne Rose Spencer, M.P.H., Arialdi M. Miniño, M.P.H., and
    Margaret Warner, Ph.D., "Drug Overdose Deaths in the United States,
    2001-2021," NCHS Data Brief, No. 457 (Dec. 2022) .............. 14

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION

3
Defendant Jose Angel Del Villar knew that he and his company

4
were forbidden from transacting with Jesus "Chucho" Perez Alvear.  He

5
knew that Gerardo Ortiz, the most popular singer on his record label,

6
was worried that performing in concerts promoted by Perez might get

7
Ortiz in trouble with the law.  He knew that he himself might face

8
criminal exposure if his continued business dealings with Perez were

9
discovered.  And he knew the federal government imposed these

10
sanctions because it had determined that Perez's concerts facilitated

11
money laundering for the Cártel de Jalisco Nueva Generación (CJNG),

12
one of the world's most brutal criminal organizations.  But rather

13
than cut off economic ties with Perez or seek a license to continue

14
to do business with him, defendant ignored Perez's designation and

15
hid their business dealings.  He directed several others to take

16
steps to avoid getting caught, all while continuing to engage in

17
financial dealings with Perez that generated over $1.5 million.  And

18
at no time has he accepted any responsibility for his actions.

19
To properly consider the severity of defendant's conduct, it is

20
important to keep in mind the nature of sanctions law.  Under the

21
Kingpin Act, what otherwise might be lawful becomes unlawful if it

22
involves transacting with a designated person.  The whole point of

23
the sanctions regime -- to economically isolate and cripple foreign

24
bad actors -- depends on U.S. persons taking sanctions designations

25
seriously.  Defendant did not.  And he directed several others not to

26
do so.  The facts here warrant a guideline sentence, which will

27
confirm that willful and brazen violations of sanctions law come with

28
serious consequences.

As set forth below, the government recommends a sentence of 78 months' imprisonment, a three-year term of supervised release, a $300,000 fine, and a mandatory special assessment of $1,100.

## II.    STATEMENT OF FACTS

Extensive motion practice, a lengthy evidentiary hearing, and a two-week trial, and the plea agreements of several co-conspirators have established the following:

Defendant is the CEO of codefendant Del Entertainment, Inc.  On April 6, 2018, the Office of Foreign Assets Control ("OFAC") designated codefendant Perez and his company, Gallistica Diamante, as Specially Designated Narcotics Traffickers ("SDNTKs") under the Foreign Narcotics Kingpin Designation Act (the "Kingpin Act").  Perez was a music promoter and manager who represented Ortiz (Del Entertainment's most popular artist) and others for concerts they performed in Mexico and for which Del Entertainment received a portion of the revenues.  At the time that OFAC designated Perez as an SDNTK, Ortiz was scheduled to perform at an upcoming concert in Aguascalientes, Mexico (April 27, 2018), which Perez was promoting and for which Perez was acting as Ortiz's manager/agent in Mexico.

Perez's designation resulted in an inquiry from an outside entity to a Del publicist to determine whether Del/Ortiz intended to respond to news of their Mexico-based promoter's OFAC designation. (Tr. Exh. 89.)  Brian Gutierrez, an employee of Del Entertainment, prepared a draft press release on behalf of Ortiz, which was never released, addressing the OFAC designation of Perez and claiming not to have ongoing business ties to him.  Defendant was on a text message chain that included a draft press release and supported the decision not to release it.  (Tr. Exh. 348.)

In mid-April 2018, codefendant Scalisi expressed concern with defendant creating a "paper trail" reflecting earlier business dealings with Perez, who Scalisi said was under Homeland Security watch.  (Tr. Exh. 9.)

On April 19, 2018, federal agents met with Ortiz at Phoenix Sky Harbor Airport, just over a week before the Aguascalientes concert, and served him with a letter informing him of Perez's OFAC designation and warning him of the potential consequences of performing in concerts involving Perez going forward.  (Tr. Exhs. 1, 10.)  Ortiz testified that he shared the letter with Gutierrez and discussed it with defendant, and that Ortiz skipped his previously-booked commercial flight to Mexico.  Internally, however, Del Villar and Perez were making arrangements to ensure Ortiz did in fact perform in the concert as scheduled, notwithstanding Perez's OFAC designation and the notification provided to Ortiz.

Specifically, when Ortiz did not take the commercial flight, at defendant's direction, defendant took the unusual step of paying over $49,000 for a charter flight to take Ortiz to perform at the Aguascalientes concert.  Perez communicated with defendant using a burner phone (as instructed by defendant's associate) and defendant agreed to front payment for that chartered flight.  (CR 93, ¶ 9.) Defendant insisted that Perez obtain a letter from the local government in Aguascalientes stating that the concert was being performed at the invitation of the City of Aguascalientes, which defendant informed Perez was for the purpose of making it appear that Perez was not affiliated with the concert, even though defendant knew that Perez remained a promoter and a financial beneficiary of the concert.  (Id.)  Perez helped obtain the letter and helped arrange

3

1  for it to be sent an email account affiliated with Del Entertainment.

2  (Id.; Tr. Exh. 93.)  Early in the morning of April 28, 2018, after

3  flying to Mexico on the charter flight that Del Villar paid for and

4  for which Scalisi provided the credit card for payment, Ortiz sang at

5  the Aguascalientes concert.

6      As established at trial, after the Aguascalientes concert, Ortiz

7  and Perez met in Mexico, where Perez obtained Ortiz's assurance that

8  Ortiz still intended to perform in the concerts that Del Villar and

9  Perez had booked for Ortiz.  Thereafter, Del Villar continued to send

10 Ortiz to perform in concerts in Mexico knowing that Perez was

11 receiving a cut of the proceeds for each concert Ortiz performed in

12 Mexico.  (CR 93 (Perez Plea Agreement), ¶ 9; Tr. Exh. 101 (Ortiz Plea

13 Agreement filed 4/10/24 in Case No. 24-cr-226-MEMF), ¶ 9.)  Del

14 Entertainment maintained internal books referencing other names, not

15 Perez's, corresponding to such concerts.  (Tr. Exh. 12.)  After

16 Perez's OFAC designation, Del Villar would refer to Perez not by his

17 real name, but by the alias "Pedro."  (CR 93, ¶ 9; Tr. Exhs. 15A,

18 32.)  Between the April 2018 Aguascalientes concert and the end of

19 March 2019 (when Del Villar and Ortiz finally separated), Ortiz

20 performed in additional concerts in Mexico that ran afoul of the

21 Kingpin Act because Perez continued to have a property interest in

22 the transactions, and for which the total amount paid for concerts

23 totaled over $1,500,000.  (CR 93 (Plea Agreement), ¶ 9; Tr. Exh. 101

24 (Ortiz Plea Agreement), ¶ 9.)  While defendant filed objections to

25 the PSR suggesting that Ortiz's testimony at trial was equivocal on

26 whether the amount was above $1.5 million, both Ortiz's plea

27 agreement and Perez's plea agreement are consistent on this point.

28

1    Testimony and exhibits both at trial and at the prior

2    evidentiary hearing, as well as the PSR, confirm that defendant was

3    and is in complete control of Del Entertainment.  The jury accepted

4    the facts above and made a special finding that defendant not only

5    violated the Kingpin act, but that he was an officer, director, or

6    agent of Del Entertainment, which also violated the Kingpin Act.  (CR

7    543.)

8    **III. SENTENCING GUIDELINES**

9    Consistent with the evidence at trial and the other plea

10   agreements filed in this case, the PSR calculates defendant's

11   sentencing guidelines as follows:

| Base Offense Level | 22 (6+16) | USSG §§ 2S1.3(a)(2), 2B1.1(b)(1)(I) |
|---|---|---|
| Proceeds of Illegal Activity | +2 | USSG § 2S1.3(b)(1)(A) |
| Organizer/Leader | +4 | USSG § 3B1.1(a) |
| **Total** | **28** | |

17   Although defendant has several old misdemeanor convictions for

18   battery, disturbing the peace, and driving without a license, these

19   garner no criminal history points.  He therefore falls within

20   Criminal History Category I and faces a guideline range of **78 to 97**

21   **months' imprisonment.**  The government concurs with the PSR's reasoned

22   analysis and recommends a guideline sentence of 78 months'

23   imprisonment, which falls at the low end of this range.

24   Defendant raises various objections to this guideline

25   calculation.  None is persuasive.  First, however, it is worth

26   explaining why reliance on § 2S1.3 is appropriate.

### A.    Determining the Most Analogous Guideline

There is no expressly applicable guideline for a violation of 21 U.S.C. § 1904(c).  Thus, under USSG § 2X5.1, the Court must "apply the most analogous offense guideline."  The government has found no controlling authority as to what constitutes the most analogous guideline for a violation of the Kingpin Act.  In fact, the Probation Office in the District of Colombia has concluded that "that no sufficiently analogous guideline for the Kingpin Act is provided in the Guidelines Manual."  United States v. Oseguera Gonzalez, 507 F. Supp. 3d 137, 171 (D.D.C. 2020).  And the Sentencing Commission has indicated that, from approximately 2015 through 2020, only "two individuals were convicted under 21 U.S.C. § 1904(c)(2), with one sentenced pursuant to U.S.S.G. § 2S1.1 . . . and the second pursuant to U.S.S.G. § 2D1.1 because of an additional controlled substance conviction."  Id. at 171 n. 26.

The PSR concluded, and the government agrees, that here, the most analogous guideline provision is § 2S1.3, "Structuring Transactions to Evade Reporting Requirements; Failure to Report Cash or Monetary Transactions; Failure to File Currency and Monetary Instrument Report; Knowingly Filing False Reports; Bulk Cash Smuggling; Establishing or Maintaining Prohibited Accounts."  The title is then further explained in the provision's commentary: "This guideline also covers offenses under 31 U.S.C. §§ 5318 and 5318A, pertaining to records, reporting and identification requirements, prohibited accounts involving certain foreign jurisdictions, foreign institutions, and foreign banks, and other types of transactions and types of accounts."  These descriptions are consistent with the conduct here, where defendants structuring their financial

transactions in a way that avoids OFAC's sanctions and licensing requirements.

The other potentially analogous guideline is § 2M5.1.  Since 2020, Kingpin Act prosecutions out of the District of the District of Columbia and the Southern District of New York resulted in sentences using USSG § 2M5.1, though in both instances, the cases resolved via plea agreement.  The courts in those cases both used a base offense level of 26 because the offense involved evasion of "national security controls."  USSG § 2M5.1(a)(1)(A); cf. 21 U.S.C. § 1901(b) ("It shall be the policy of the United States to apply economic and other financial sanctions to significant foreign narcotics traffickers and their organizations worldwide to protect the national security, foreign policy, and economy of the United States . . . ." (emphasis added)).[1]

While the government agrees with the PSR that § 2S1.3 is the most analogous guideline, it notes that the offense level of 24 calculated under § 2S1.3 (prior to role adjustment) is close to the offense level of 26 under the alternative most-analogous guideline, § 2M5.1.  This further underscores the absurdity of adopting defendant's proposed offense level of 6 under the Safe Harbor provision of § 2S1.3.

---

[1] In United States v. Ghacham, Inc., No. CR 22-424-MEMF, the corporate defendant's plea agreement referenced § 2M5.1 with respect to its Kingpin Act offense, though the guidelines calculation was driven by the substantial customs fraud the company perpetrated.  (CR 8, at 18.)  Because § 2M5.1 does not result in a Chapter 8 fine calculation, however, the Court did not ultimately need to make the determination that whether the elevated base offense level applied.  See USSG § 8C2.1 (omitted § 2M5.1).

7

**B.    The Value of the Funds Involved Exceeds $1.5 Million**

Defendant first challenges the PSR's finding that the funds involved in his sanctions evasion offense exceeded $1.5 million, attributing it solely to the testimony of Gerardo Ortiz at trial and then attempting to wield his one-off remark "more or less" as an indication the evidence equally supports a lower figure.  The reality is that Ortiz already admitted, under oath and with the advice of counsel, that the "total amount paid for concerts in which [he], Perez, and Del Villar/Del Entertainment had a financial interest following defendant's OFAC designation was in excess of $1,500,000 U.S. dollars (after conversion from Mexican pesos)."  (Tr. Exh. 101, at 10.)  Contrary to defendant's latest attack on Ortiz's credibility (CR 573, at 4), Ortiz's admission to this figure is not explicable as merely advancing his own interest, since it results in a higher guideline range for him as well.  Perez also agreed to this math in his own plea agreement and stipulated to it under oath at his plea hearing with the benefit of counsel.  (CR 93, at 10, 11.)

It is also undisputed that certain of the transactions in which Perez, defendant/Del Entertainment, and Ortiz shared a financial interest involved deposits to Del Entertainment's Mexico-based bank account, and some of the transactions were in cash.  Only defendant, Perez, and Ortiz would have necessarily been aware of the total value -- including cash -- of these transactions.  Two of those individuals swore under oath that the total amount was in excess of $1.5 million and agreed to subject themselves to a higher guideline range based on that figure.  The third individual is defendant.  Collectively, this evidence establishes by far more than a preponderance of the evidence

1  that the value of the funds involved in defendant's illicit

2  transactions exceeded $1.5 million.

3  **C.  The Value of the Funds Involved Should Not Be Limited to**

4  **Defendant's Gain**

5  Section 2S1.3 refers to "the value of the funds," which is

6  further defined in the application notes as "the amount of the funds

7  involved in the structuring or reporting conduct."  USSG § 2S1.3,

8  comment. (n(1)).  Here, the value of the funds involved in

9  defendant's sanctions violations exceeded $1.5 million.

10  Contrary to the guideline's text, defendant argues that the

11  Court should instead limit its calculation to defendant's own

12  profits.  Defendant cites caselaw concerning the calculation of <u>loss</u>

13  under USSG § 2B1.1, but this is a category error.  Section 2S1.3 does

14  not concern stolen or fraudulently obtained funds, but illegal

15  transactions like defendant's Kingpin Act violations.  In fact,

16  § 2B1.1 explicitly directs that "[t]he court shall use the gain that

17  resulted from the offense as an alternative measure of loss only if

18  there is a loss but it reasonably cannot be determined."  USSG

19  § 2B1.1(b)(1), n.(A).  There is no similar language in § 2S1.3.

20  Defendant's logic also misapprehends the purpose of sanctions

21  law, which is to isolate foreign bad actors.  While defendant's share

22  of the proceeds may explain his motivation, the actual crime was

23  transacting business with Perez, who had been designated as a CJNG

24  affiliate.  A U.S. person who writes a check to fund the cartels is

25  no less guilty of violating the Kingpin Act if he acts out of

26  ideological commitment or even charity rather than pecuniary

27  interest.

28

9

1     Finally, defendant asserts, without support, that "the total

2  revenue from these concerts was not reasonably foreseeable to" him.

3  (CR 573, at 7.)  To the contrary, the evidence in the case shows that

4  defendant negotiated directly with Perez and the two organized the

5  operation together.  (CR 93, ¶ 9.)

6     **D.    Defendant Knew the Funds Involved in His Illicit**

7          **Relationship with Perez Were Proceeds of, or Intended to**

8          **Promote, Unlawful Activity**

9     The PSR appropriately applied a two-level increase because

10  defendant "knew or believed that the funds were proceeds of unlawful

11  activity, or were intended to promote unlawful activity."  USSG

12  § 2S1.3(b)(1)(A).  Defendant raises two objections.  First, he

13  contends, "There is nothing illegal about promoting or performing at

14  a music concert, so it follows that the funds at issue did not come

15  from illegal activity."  (CR 573, at 10.)  This is merely a

16  repetition of the same incorrect analysis that this Court previously

17  rejected in his motion to dismiss.  "The making of any contribution

18  or provision of . . . services by, to, or for the benefit" of a

19  listed person is a prohibited transaction under the Kingpin Act's

20  sanctions.  31 C.F.R. § 598.202(b)(1).  Money that resulted from

21  those prohibited services -- directed by defendant and his company --

22  is therefore the proceeds of illegal activity, and any payment in

23  advance for such services promotes illegal activity.

24     Second, defendant complains this enhancement constitutes

25  "impermissible double counting."  Impermissible double counting

26  occurs "only where, absent such conduct, it is impossible to come

27  within that guideline."  United States v. Reese, 2 F.3d 870, 895 (9th

28  Cir. 1993).  In other words, if the category itself and an increase

within the guideline are coextensive.  That is not, however, the same thing as saying that everyone who commits a particular offense receives a particular adjustment.  For example, § 2S1.3 provides a higher base offense level if the defendant "was convicted under 31 U.S.C. § 5318 or § 5318A," and the very adjustment to which defendant objects applies in all instances of "cash smuggling."  USSG § 2S1.3(a)(1), (b)(1)(A).  A money laundering conviction under 18 U.S.C. § 1956 likewise receives an additional two-level increase under the money laundering guidelines.  USSG § 2S1.1(b)(2)(B).  But just as there are ways to fall within § 2S1.1 without violating § 1956, so too can defendants fall within § 2S1.3 without violating the Kingpin Act.

Finally, defendant vaguely suggests that the government is estopped from arguing this adjustment applies because other plea agreements in this case did not require the defendants to stipulate to it.  That a plea agreement stipulates to some guidelines and leaves others open to argument does not constitute a waiver.  And even if the government was simply remiss in failing to include the adjustment in another plea agreement, that neither limits the government's capacity to argue for the appropriate guidelines here nor constrains the Court, which is not bound by the plea agreements in any event.

### E.    The Safe Harbor Does Not Apply

Because defendant receives an adjustment under § 2S1.3(b)(1)(A), the safe harbor reduction under § 2S1.3(b)(3) does not apply on its face.  Indeed, defendant's analysis is subject to reasoning by reductio ad absurdum, for by his logic, every sanctions violation case under § 2S1.3 would fall under the safe harbor unless it

involved transactions constituting independently criminal activity. But that defeats the very purpose of the sanctions regime, which all parties at trial agreed is intended to cut off foreign bad actors from the U.S. economy.  It also cannot be squared with the thirty-year statutory maximum Congress established for officers and directors of entities that violate the Kingpin Act -- a heightened penalty to which defendant is subject.  The idea that knowingly doing business with sanctioned individuals -- cartels, terrorists, transnational organized crime -- can result in an offense level of six even after conviction at trial is frankly ridiculous.

**F.    Defendant Was an Organizer or Leader of Extensive Criminal Conduct**

At the outset, the government agrees with defendant in one component of his analysis: his position of authority within Del Entertainment is not the same as his position of authority within the criminal conspiracy.  That is why, for example, the government agrees that codefendant Scalisi, though an executive at a related company, should receive a minor role reduction, since he was acting at defendant's behest and principally for defendant's benefit.  But in defendant's case, he was the leader of both the legal and illegal business at issue.

The evidence at trial was sufficient to show defendant directed the sanctions violations of both Ortiz and codefendant Scalisi. Indeed, Ortiz had canceled his flight and Del's publicist was drafting a press release explaining his absence from the Aguascalientes concert when defendant intervened to ensure he performed as planned.  Codefendant Scalisi's early reaction to learning of Perez's designation was to raise concern with Gutierrez

that defendant was acting without thinking in memorializing his dealings with Perez.  Defendant even directed the activities of Perez, insisting that he obtain a letter from the Aguascalientes local government to create the false impression Perez was uninvolved and concocting the "Pedro" pseudonym by which Perez would be referred.  (CR 93, at 8-9).

With respect to whether defendant's conspiracy was "otherwise extensive," the commentary to the guideline offers guidance: "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  USSG § 3B1.1, comment. (n.3).  That is precisely what occurred here.  While codefendant Scalisi and Ortiz were knowing participants (and are now facing the consequences of following defendant's directions), Ortiz's participation in various concerts involved the entire Del Entertainment apparatus, including the various employees who were unaware of defendant's sanctions evasion.  And, of course, Perez did not act alone, but also employed individuals who facilitated the sanctions evasion, such as "Pollo" (Tr. Exh. 32, at 5-6).[2]

Because defendant should receive an aggravating role adjustment, he is ineligible for the zero-point offender reduction.  See USSG § 4C1.1(a)(10).

_____

[2] In determining role, "the proper comparison is to the average of all of the individuals who participated in [the] offense, including those that the district court believed were leaders or organizers or who were otherwise highly culpable."  United States v. Dominguez-Caicedo, 40 F.4th 938, 963 (9th Cir. 2022).

## IV.  ARGUMENT

### A.    The Need for General Deterrence

When it comes to violations of the Kingpin Act and other economic sanctions regimes, the need "to afford adequate deterrence" is the most significant sentencing factor.  18 U.S.C. § 3553(a)(2)(B).  The Kingpin Act was enacted in 2002 as a measure to "use aggressively and creatively all legal means available to combat international crime" in light of the "national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States."  21 U.S.C. § 1901(a)(1), (4).  Since then, that national emergency has only deepened.  Drug overdose deaths per capita in the United States increased nearly fivefold from 2001 to 2021.[3]  And CJNG, the cartel to which Perez and his business had ties, has recently been designated a Foreign Terrorist Organization for its threats to national security.[4]

Given the severity of the national security, public health, and foreign policy concerns at play, economic sanctions are a vital tool in cutting bad actors off from the benefits of the American economy.  But for sanctions to work, U.S. individuals and businesses must comply with them, and even a few defectors are enough to collapse the program into a collective action problem.  Violations must be met

---

[3] Merianne Rose Spencer, M.P.H., Arialdi M. Miniño, M.P.H., and Margaret Warner, Ph.D., "Drug Overdose Deaths in the United States, 2001-2021," NCHS Data Brief, No. 457, at 1 (Dec. 2022), available at https://www.cdc.gov/nchs/data/databriefs/db457.pdf.

[4] See Pres Release, U.S. Dep't of State, Designation of International Cartels (Feb. 20, 2025), available at https://www.state.gov/designation-of-international-cartels.

with serious punishment.  That is why even a negligent violation of Kingpin Act sanctions can subject a person to hefty civil penalties.

Because sanctions regimes generally cover international business dealings, they by their very nature disproportionately affect sophisticated actors like businesses, executives, and the professionals they employ.  Such individuals and business are capable of weighing risks and rational cost-benefit analyses, so the certainty and severity of criminal sanctions are key to making the regime work.  At the same time, many illicit transactions occur in foreign countries that are not necessarily supportive of these sanctions, making detection all the more difficult.  The penalty defendants face must therefore be sufficient to offer deterrence even for those wrongdoers who believe their chance of being caught is low.

Finally, consideration of deterrence is necessary in the specific context of defendant's crime, which was driven by greed. Economic crimes like defendant's are quintessentially deterrable so long as they are met with significant term of imprisonment.  "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).

**B.   The Seriousness of Defendant's Personal Conduct**

Far from being an unwitting participant in a "gotcha" crime, defendant orchestrated a sophisticated criminal scheme sustained over a lengthy period of time and involving myriad unlawful transactions. Defendant directed Perez to obtain a ruse letter from the

15

Aguascalientes local government to paper over Perez's involvement.
CR 93, ¶ 9.)  He devised the pseudonym "Pedro" to cover up Perez's
identity.  (Id.; Tr. Exhs. 15A, 32.)  And he organized Ortiz to
perform in at least nineteen concerts in which Perez was involved
after his OFAC designation.  (Tr. Exh. 109.)  Such conduct reflects
the "seriousness of the offense" and the need for the sentence to
provide "just punishment."  18 U.S.C. § 3553(a)(2)(A); cf. USSG
§ 2B1.1(b)(10) (providing a guideline enhancement for white-collar
offenses where "a substantial part of a fraudulent scheme was
committed from outside the United States" or the offense "otherwise
involved sophisticated means").

Defendant, in his objections to the PSR, contends that his
profits from the criminal enterprise were relatively modest.  Given
his considerable wealth, this may be so.  This is, in reality, an
aggravating factor, as it reflects how casually defendant, a wealthy
and successful businessman, disregarded the law for his own gain
knowing full well the evils drug cartels have wrought in both Mexico
and the United States.

Finally, defendant not only broke the law himself, but recruited
others to do so.  Although it does not absolve them of criminal
liability for their own actions, the facts here support the
conclusion that, but for defendant, neither Ortiz nor Scalisi would
likely have violated the Kingpin Act.  The former had already skipped
his flight to Aguascalientes.  The latter warned that Perez was under
what he described as Homeland Security watch.  That defendant both
blatantly disregarded the law and wrapped up others in his criminal
acts further reflects on the seriousness of his crimes.

16

### C.    Other Defendants Sentenced under the Kingpin Act

Though prosecutions under the Kingpin Act are rare, the government has identified two other cases under the Kingpin Act, both of which were resolved by plea agreement, that illustrate that a significant sentence is warranted here.  See 18 U.S.C. § 3553(a)(6) (outlining the "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

Probably most analogous is United States v. Mones Coro, No. CR 19-144-AKH (S.D.N.Y.), where the defendant violated the Kingpin Act and received a four-level aggravating role adjustment.  That defendant received a 55-month sentence, though unlike the defendant in this case, he timely accepted responsibility.  Mones Coro pleaded guilty to five counts of the Kingpin Act and the parties agreed that § 2M5.1 applied.  (CR 169 at page 16 of 26.)  Defendant received a four-level aggravating role adjustment and a three-level reduction for acceptance of responsibility, resulting in a guidelines range of 70-87 months' imprisonment and was sentenced to 55 months' imprisonment.  United States v. Mones Coro, No. 21-924, 2022 WL 1565698, at *1 (2d Cir. May 18, 2022).  Affirming the sentence and the four-level aggravating role adjustment, the Second Circuit held that, in the context of the Kingpin Act, "leadership status does not turn on the fact that the individuals sanctioned by OFAC were above [defendant] in the hierarchy of the criminal scheme."  Id. at 2.  Rather, the defendant warranted a four-level leadership role where he, as "owner and president of" his company, "led the scheme to provide flight services to OFAC-sanctioned individuals in violation of the Kingpin Act and its related regulations: he decided how to

17

organize and arrange the flights, directed pilots to provide the flights, devised procedures to avoid detection by law enforcement, and received millions of dollars in payment for his services." The Second Circuit also note that "[t]he scheme depended on the resources of [defendant's company] – its airplanes, employees, accounting services, bank accounts, contracted pilots, and Federal Aviation Administration certification for charter-type air services – and [defendant] exercised significant discretion over how to use those resources." Id. Here, similarly, the scheme depended on defendant's willingness to send his main artist to perform in concerts that defendant himself negotiated with the sanctioned individual. And unlike Mones Caro, who was sentenced to 55 months after pleading guilty and receiving a three-level reduction for acceptance of responsibility, defendant here put the government to its burden at trial.

In United States v. Oseguera-Gonzalez, No. CR 20-40-BAH (D.D.C. 2021), the defendant, the daughter of the head of the CJNG Cartel and herself a U.S. person, pleaded guilty to violating the Kingpin Act based on the fact that she "continued to maintain a managerial or ownership interest" in various businesses she owned in Mexico after they were designated pursuant to the Kingpin Act. Oseguera-Gonzalez, Dkt. 214, at 5. Though the amount of the funds involved were not spelled out in her plea agreement, the parties agreed she should not receive an aggravating role reduction and that she should receive a two-level reduction for acceptance of responsibility in light of her guilty plea. Id., Dkt. 213, at 3. She received a 30-month sentence, which itself represented a downward variance from the guideline range. Defendant, by contrast, put the government to its burden at

18

1  trial and was a leader or organizer of extensive criminal conduct.

2  His sentence should therefore be considerably higher to reflect these

3  aggravating factors.

4     Finally, the rarity of Kingpin Act prosecutions is a reminder of

5  the importance of general deterrence, since any sentence the Court

6  imposes will become a benchmark in a limited set of data for future

7  cases.

8     **D.   The Appropriate Fine**

9     Given the sentence of imprisonment he is facing, the government

10  has no objection to the guideline fine of $300,000 he is facing.

11  However, as explained in the government's sentencing position with

12  respect to codefendant Del Entertainment, Inc., which he owns and

13  controls, defendant has 100-percent ownership of Del Records and Del

14  Publishing, which combined are worth approximately $100 million.  (CR

15  468, ¶ 101(iv)(1), (2).)  His attempts now to claim poverty on Del

16  Entertainment's behalf should therefore be rejected as an effort to

17  shirk responsibility.  To the extent the Court concludes, however,

18  that Del Entertainment as an independent entity cannot pay a fine

19  over $30,000, then it should exercise its discretion to apply the

20  appropriate fine in that case -- $6.7 million -- to defendant.

21  **V.   CONCLUSION**

22     For the foregoing reasons, the government respectfully requests

23  that this Court impose a sentence of 78 months' imprisonment, a

24  three-year term of supervised release, a $300,000 fine, and a

25  mandatory special assessment of $1,100.

26

27

28

19

The undersigned, counsel of record for the United States, certifies that this brief contains 5,018 words, which complies with the word limit of L.R. 11-6.1.


Dated: August 1, 2025              Respectfully submitted,

                                   BILAL A. ESSAYLI
                                   Acting United States Attorney

                                   CHRISTINA T. SHAY
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                        /s/
                                   _____
                                   BENEDETTO L. BALDING
                                   ALEXANDER B. SCHWAB
                                   Assistant United States Attorney

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA